## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

           v.

UNITED TECHNOLOGIES CORPORATION

and

ROCKWELL COLLINS, INC.,

      Defendants.

CASE NO. 1:18-cv-02279-RC

JUDGE:  Rudolph Contreras

## **FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on October 1, 2018, the United States and Defendants, United Technologies Corporation ("UTC") and Rockwell Collins, Inc. ("Rockwell Collins"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.   <u>JURISDICTION</u>

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.   <u>DEFINITIONS</u>

As used in this Final Judgment:

A.      "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest any of the Divestiture Assets.

B.      "Acquirer of the Ice Protection Divestiture Assets" means the entity to which Defendants divest the Ice Protection Divestiture Assets.

C.      "Acquirer of the THSA Divestiture Assets" means Safran S.A. or the entity to which Defendants divest the THSA Divestiture Assets.

D.      "UTC" means defendant United Technologies Corporation, a Delaware corporation with its headquarters in Farmington, Connecticut, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Rockwell Collins" means defendant Rockwell Collins, Inc., a Delaware corporation with its headquarters in Cedar Rapids, Iowa, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

F.      "Ice Protection Business" means Rockwell Collins' SMR Technologies division, including Rockwell's business in the development, manufacture, and sale of pneumatic ice protection systems and other ice protection products.

G.      "WEMAC Product Line" means the Rockwell Collins products sold under the WEMAC name, including air gasper valves and interior signage components.

H.      "Ice Protection Divestiture Assets" means Rockwell Collins' Ice Protection Business, including:

1.      The facility located at 93 Nettie-Fenwick Road, Fenwick, West Virginia ("Fenwick Facility");

2.      All tangible assets primarily related to the Ice Protection Business, with the exception of those used exclusively in the WEMAC Product Line, including but not limited to research and development activities; all manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property; all licenses, permits, certifications, and authorizations issued by any governmental organization relating to the Ice Protection Business; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Ice Protection Business;

3.      All intangible assets primarily related to the Ice Protection Business, with the exception of those used exclusively in the WEMAC Product Line, including, but not limited to, all patents; licenses and sublicenses; intellectual property; copyrights; trademarks; trade names; service marks; service names; technical information; computer software and related documentation; know-how; trade secrets; drawings; blueprints; designs; design protocols; specifications for materials; specifications for parts and devices; safety procedures for the handling of materials and substances; quality assurance and control procedures; design tools and simulation capability; all manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees; and all research data concerning historic and current research and development efforts relating to the Ice Protection Business, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments.

I.      "THSA Divestiture Business" means Rockwell Collins' business in the design, development, manufacture, sale, service, or distribution of: (i) trimmable horizontal stabilizer actuators ("THSAs"), legacy flap actuation, and nose wheel steering gear boxes; and (ii) pilot control systems, including center yokes, rudder brake pedal units, throttle quadrant assemblies, auto-throttles, and control stand modules.

J.      "THSA Divestiture Assets" means, subject to the terms of Paragraph V(D) of this Final Judgment:

1.      The facilities located at 1833 Alton Parkway, Irvine, California ("Building 518") and Ave. Sierra San Agustin #2498, Col. El Porvenir C.P. 21185, Mexicali, Mexico ("Building 1");

4

2.      At the option of the Acquirer of the THSA Divestiture Assets, the facilities located at 1733 Alton Parkway, Irvine, California ("Building 517"), 1100 W. Hibiscus Boulevard, Melbourne, Florida ("Building 213"), and Ave. Sierra San Agustin #2498, Col. El Porvenir C.P. 21185, Mexicali, Mexico ("Building 2");

3.      All tangible assets primarily related to or necessary for the operation of the THSA Divestiture Business, including but not limited to research and development activities, all manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property; all licenses, permits, certifications, and authorizations issued by any governmental organization relating to the THSA Divestiture Business; all contracts; all teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the THSA Divestiture Business;

4.      All intangible assets primarily related to or necessary for the operation of the THSA Divestiture Business, including, but not limited to, all patents; licenses and sublicenses; intellectual property; copyrights; trademarks; trade names; service marks; service names; technical information; computer software and related documentation; know-how; trade secrets; drawings; blueprints; designs; design protocols; specifications for materials; specifications for parts and devices; safety procedures for the handling of materials and substances; quality assurance and control procedures; design tools and simulation capability; all manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees; and all research data concerning historic and current research and

development efforts relating to the THSA Divestiture Business, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments.

K.      "Divestiture Assets" means the Ice Protection Divestiture Assets and the THSA Divestiture Assets.

L.      "Required Regulatory Approvals" means (1) clearance pursuant to any Committee on Foreign Investment in the United States ("CFIUS") filing or similar foreign investment filing, if any, made by the Defendants and/or any Acquirer of the Divestiture Assets; and (2) any approvals or clearances required under antitrust or competition laws.

### III.      APPLICABILITY

A.      This Final Judgment applies to UTC and Rockwell Collins, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.       If, prior to complying with Section IV, Section V, and Section VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, Defendants shall require the purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Final Judgment.

### IV.      DIVESTITURE OF THE ICE PROTECTION DIVESTITURE ASSETS

A.      Defendants are ordered and directed, within the later of (1) five (5) calendar days after notice of entry of this Final Judgment by the Court or (2) fifteen (15) calendar days after Required Regulatory Approvals have been received to divest the Ice Protection Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more

extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Ice Protection Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestiture of the Ice Protection Divestiture Assets ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Ice Protection Divestiture Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Ice Protection Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Ice Protection Divestiture Assets customarily provided in a due diligence process, except information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.      Defendants shall provide the Acquirer of the Ice Protection Divestiture Assets and the United States information relating to the personnel involved in the design, development, production, distribution, sale, or service of products by or under any of the Ice Protection Divestiture Assets to enable the Acquirer of the Ice Protection Divestiture Assets to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer of the Ice Protection Divestiture Assets to employ any Defendant employee whose primary responsibility is the design, development, production, distribution, sale, or service of products by or under any of the Ice Protection Divestiture Assets.

D.      Defendants shall permit prospective Acquirers of the Ice Protection Divestiture

Assets to have reasonable access to personnel and to make inspections of the physical facilities

to be divested; access to any and all environmental, zoning, and other permit documents and

information; and access to any and all financial, operational, or other documents and information

customarily provided as part of a due diligence process.

E.      Defendants shall warrant to the Acquirer of the Ice Protection Divestiture Assets

that each asset will be operational on the date of sale.

F.      Defendants shall not take any action that will impede in any way the permitting,

operation, or divestiture of the Ice Protection Divestiture Assets.

G.      Defendants shall warrant to the Acquirer of the Ice Protection Divestiture Assets

(1) that there are no material defects in the environmental, zoning, or other permits pertaining to

the operation of the Ice Protection Divestiture Assets, and (2) that following the sale of the Ice

Protection Divestiture Assets, Defendants will not undertake, directly or indirectly, any

challenges to the environmental, zoning, or other permits relating to the operation of the Ice

Protection Divestiture Assets.

H.      At the option of the Acquirer of the Ice Protection Divestiture Assets, Defendants

shall enter into a transition services agreement with the Acquirer of the Ice Protection Divestiture

Assets to provide back office and information technology services and support for the Ice

Protection Divestiture Assets for a period of up to twelve (12) months.  The United States, in its

sole discretion, may approve one or more extensions of this agreement for a total of up to an

additional twelve (12) months.  If the Acquirer of the Ice Protection Divestiture Assets seeks an

extension of the term of this transition services agreement, it shall so notify the United States in

writing at least three (3) months prior to the date the transition services contract expires.  If the

United States approves such an extension, it shall so notify the Acquirer of the Ice Protection Divestiture Assets in writing at least two (2) months prior to the date the transition services contract expires.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to the market value of the expertise of the personnel providing any needed assistance.  The UTC employee(s) tasked with providing these transition services may not share any competitively sensitive information of the Acquirer of the Ice Protection Divestiture Assets with any other UTC employee.

I.      Defendants shall remove from the Fenwick Facility the assets used exclusively with the WEMAC Product Line within nine (9) months of the divestiture of the Ice Protection Divestiture Assets.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed three (3) months in total.

J.      Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by Divestiture Trustee appointed pursuant to Section VI, of this Final Judgment, shall include the entire Ice Protection Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Ice Protection Divestiture Assets can and will be used by the Acquirer of the Ice Protection Divestiture Assets as part of a viable, ongoing business of the development, manufacture, sale, service, or distribution of pneumatic ice protection systems.  The divestiture, whether pursuant to Section IV or Section V of this Final Judgment,

> (1)     shall be made to an Acquirer of the Ice Protection Divestiture Assets that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the business of the development, manufacture, and sale of pneumatic ice protection systems; and
>
> (2)     shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer of

the Ice Protection Divestiture Assets and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V.    DIVESTITURE OF THE THSA DIVESTITURE ASSETS

A.    Defendants are ordered and directed, within the later of (1) five (5) calendar days after notice of entry of this Final Judgment or (2) fifteen (15) calendar days after Required Regulatory Approvals have been received, to divest the THSA Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion.  At the option of the Acquirer of the THSA Divestiture Assets, and subject to the review and approval by the United States, Building 518 may be transferred via a sublease in lieu of a divestiture.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances.  Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.    In the event Defendants are attempting to divest the THSA Divestiture Assets to an Acquirer other than Safran S.A., Defendants promptly shall make known, by usual and customary means, the availability of the THSA Divestiture Assets.  Defendants shall inform any person making an inquiry regarding a possible purchase of the THSA Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the THSA Divestiture Assets customarily provided in a due diligence process except information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall

10

make available such information to the United States at the same time that such information is made available to any other person.

C.      Defendants shall provide the Acquirer of the THSA Divestiture Assets and the United States information relating to the personnel involved in the design, development, production, distribution, sale, or service of products by or under any of the THSA Divestiture Assets to enable the Acquirer of the THSA Divestiture Assets to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer of the THSA Divestiture Assets to employ any Defendant employee whose primary responsibility is the design, development, production, distribution, sale, or service of products by or under any of the THSA Divestiture Assets.

D.      Defendants shall use reasonable best efforts to obtain any approvals required from United States government customers for the transfer of proprietary contracts to the Acquirer of the THSA Divestiture Assets.  If such approvals cannot be obtained, notwithstanding anything to the contrary in this Final Judgment, Defendants may:

1.      Retain the proprietary contracts and those portions thereof that cannot be subcontracted to the Acquirer of the THSA Divestiture Assets; and

2       Retain those tangible and intangible assets that have been used exclusively in the performance of the proprietary contracts.

E.      Defendants shall permit prospective Acquirers of the THSA Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities to be divested; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

F.     Defendants shall warrant to the Acquirer of the THSA Divestiture Assets that each asset will be operational on the date of sale.

G.     Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the THSA Divestiture Assets.

H.     Defendants shall warrant to the Acquirer of the THSA Divestiture Assets (1) that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the THSA Divestiture Assets, and (2) that following the sale of the THSA Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the THSA Divestiture Assets.

I.     At the option of the Acquirer of the THSA Divestiture Assets, Defendants shall enter into a transition services agreement with the Acquirer of the THSA Divestiture Assets to provide services related to facility management and upkeep, facility and asset transition, government compliance, accounting and finance, information technology and human resources for the THSA Divestiture Assets for a period of up to twelve (12) months.  The United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional twelve (12) months.  If the Acquirer of the THSA Divestiture Assets seeks an extension of the term of this transition services agreement, it shall so notify the United States in writing at least three (3) months prior to the date the transition services contract expires.  If the United States approves such an extension, it shall so notify the Acquirer of the THSA Divestiture Assets in writing at least two (2) months prior to the date the transition services contract expires. The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to the market value of the expertise of the personnel providing any needed assistance.  The UTC employee(s) tasked with providing these transition services may not share

12

any competitively sensitive information of the Acquirer of the THSA Divestiture Assets with any other UTC employee.

J.      During the term of the transition services agreement in Paragraph V(I), Defendants shall use their best efforts to assist the Acquirer of the THSA Divestiture Assets with the transition of the THSA Divestiture Assets to locations chosen by the Acquirer of the THSA Divestiture Assets and the Defendants shall not impede this transition of the THSA Divestiture Assets.

K.      At the option of the Acquirer of the THSA Divestiture Assets, Defendants shall enter into a supply agreement to provide services related to the manufacture of THSAs in Building 213 and Rockwell Collins' Iowa C Ave Complex facility located at 400 Collins Road NE, Cedar Rapids, Iowa sufficient to meet all or part of the needs of the Acquirer of the THSA Assets for a period of up to twelve months.  The United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional twelve (12) months.  If the Acquirer of the THSA Divestiture Assets seeks an extension of the term of this agreement, it shall so notify the United States in writing at least three (3) months prior to the date the contract expires.  If the United States approves such an extension, it shall so notify the Acquirer of the THSA Divestiture Assets in writing at least two (2) months prior to the date the agreement expires.  The terms and conditions of any contractual arrangement meant to satisfy this provision must be reasonably related to market conditions for such services.

L.      Unless the United States otherwise consents in writing, the divestiture pursuant to Section V, or by Divestiture Trustee appointed pursuant to Section VI, of this Final Judgment, shall include the entire THSA Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the THSA Divestiture Assets can and will be

used by the Acquirer of the THSA Divestiture Assets as part of a viable, ongoing business of the development, manufacture, and sale of THSAs.  The divestiture, whether pursuant to Section V or Section VI of this Final Judgment,

    (1)    shall be made to an Acquirer of the THSA Divestiture Assets that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the business of the development, manufacture, and sale of THSAs; and

    (2)    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer of the THSA Divestiture Assets and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## VI.    APPOINTMENT OF DIVESTITURE TRUSTEE

A.    If Defendants have not divested all of the Divestiture Assets within the time periods specified in Paragraphs IV(A) and V(A), Defendants shall notify the United States of that fact in writing.  Upon application of the United States, the Court shall appoint a Divestiture Trustee selected by the United States and approved by the Court to effect the divestiture(s) of any of the Divestiture Assets that have not been sold during the time periods specified in Paragraphs IV(A) and V(A).

B.    After the appointment of a Divestiture Trustee becomes effective, only the Divestiture Trustee shall have the right to sell those Divestiture Assets that the Divestiture Trustee has been appointed to sell.  The Divestiture Trustee shall have the power and authority to accomplish the divestiture(s) to an Acquirer(s) acceptable to the United States, in its sole discretion at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee, subject to the provisions of Sections IV, V, VI, and VII of this Final Judgment, and shall have such other powers as the Court deems appropriate.  Subject to

14

Paragraph VI(D) of this Final Judgment, the Divestiture Trustee may hire at the cost and expense

of Defendants any agents, investment bankers, attorneys, accountants, or consultants, who shall

be solely accountable to the Divestiture Trustee, reasonably necessary in the Divestiture

Trustee's judgment to assist in the divestiture(s).  Any such agents or consultants shall serve on

such terms and conditions as the United States approves, including confidentiality requirements

and conflict of interest certifications.

       C.      Defendants shall not object to a sale by the Divestiture Trustee on any ground

other than the Divestiture Trustee's malfeasance.  Any such objections by Defendants must be

conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar

days after the Divestiture Trustee has provided the notice required under Section VII.

       D.      The Divestiture Trustee shall serve at the cost and expense of Defendants

pursuant to a written agreement, on such terms and conditions as the United States approves,

including confidentiality requirements and conflict of interest certifications.  The Divestiture

Trustee shall account for all monies derived from the sale of the assets sold by the Divestiture

Trustee and all costs and expenses so incurred.  After approval by the Court of the Divestiture

Trustee's accounting, including fees for any of its services yet unpaid and those of any

professionals and agents retained by the Divestiture Trustee, all remaining money shall be paid

to Defendants and the trust shall then be terminated.  The compensation of the Divestiture

Trustee and any professionals and agents retained by the Divestiture Trustee shall be reasonable

in light of the value of the Divestiture Assets that are being sold by the Divestiture Trustee and

based on a fee arrangement that provides the Divestiture Trustee with incentives based on the

price and terms of the divestiture and the speed with which it is accomplished, but the timeliness

of the divestiture(s) is paramount.  If the Divestiture Trustee and Defendants are unable to reach

agreement on the Divestiture Trustee's or any agents' or consultants' compensation or other

terms and conditions of engagement within fourteen (14) calendar days of the appointment of the

Divestiture Trustee, the United States may, in its sole discretion, take appropriate action,

including making a recommendation to the Court.  The Divestiture Trustee shall, within three (3)

business days of hiring any other agents or consultants, provide written notice of such hiring and

the rate of compensation to Defendants and the United States.

      E.      Defendants shall use their best efforts to assist the Divestiture Trustee in

accomplishing the required divestiture(s).  The Divestiture Trustee and any agents or consultants

retained by the Divestiture Trustee shall have full and complete access to the personnel, books,

records, and facilities of the business to be divested, and Defendants shall provide or develop

financial and other information relevant to such business as the Divestiture Trustee may

reasonably request, subject to reasonable protection for trade secrets or other confidential

research, development, or commercial information or any applicable privileges.  Defendants

shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of

the divestiture(s).

      F.      After its appointment, the Divestiture Trustee shall file monthly reports with the

United States and, as appropriate, the Court setting forth the Divestiture Trustee's efforts to

accomplish the divestiture(s) ordered under this Final Judgment.  To the extent such reports

contain information that the Divestiture Trustee deems confidential, such reports shall not be

filed in the public docket of the Court.  Such reports shall include the name, address, and

telephone number of each person who, during the preceding month, made an offer to acquire,

expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made

an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail

each contact with any such person.  The Divestiture Trustee shall maintain full records of all efforts made to divest any of the Divestiture Assets.

G.      If the Divestiture Trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestiture, (2) the reasons, in the Divestiture Trustee's judgment, why the required divestiture has not been accomplished, and (3) the Divestiture Trustee's recommendations.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The Divestiture Trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by the United States.

H.      If the United States determines that the Divestiture Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, the United States may recommend the Court appoint a substitute Divestiture Trustee.

## VII.    NOTICE OF PROPOSED DIVESTITURE

A.      Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the Divestiture Trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestiture required by Sections IV, V or VI of this Final Judgment.  If the Divestiture Trustee is responsible, it shall similarly notify Defendants.  The notice shall set forth the details of the proposed divestiture(s)

and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer(s), any other third party, or the Divestiture Trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer.  Defendants and the Divestiture Trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer(s), any third party, and the Divestiture Trustee, whichever is later, the United States shall provide written notice to Defendants and the Divestiture Trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Paragraph VI(C) of this Final Judgment.  Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Sections IV, V, or VI shall not be consummated.  Upon objection by Defendants under Paragraph VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII.     <u>FINANCING</u>

Defendants shall not finance all or any part of any purchase made pursuant to Section IV, Section V, or Section VI of this Final Judgment.

## IX.   HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by the Court.  Defendants shall take no action that would jeopardize the divestitures ordered by the Court.

## X.   AFFIDAVITS

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Sections IV, V, or VI, Defendants shall deliver to the United States an affidavit, signed by UTC's Executive Vice President, Operations & Strategy and General Counsel, and Rockwell Collins' Chief Financial Officer and General Counsel, which shall describe the fact and manner of Defendants' compliance with Sections IV, V or VI of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to

information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment.  Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this Section within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI.      <u>COMPLIANCE INSPECTION</u>

A.      For the purposes of determining or securing compliance with this Final Judgment, or of any related orders such as any Hold Separate Stipulation and Order, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally-recognized privilege, from time to time authorized representatives of the United States, including agents and consultants retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)      access during Defendants' office hours to inspect and copy or, at the option of the United States, to require Defendants to provide electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2)      to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present,

regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in Section XI shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time that Defendants furnish information or documents to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII.   <u>NOTIFICATION</u>

A.      Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Defendants, without providing advance notification to the United States, shall not directly or indirectly acquire any assets of or any interest in, including any

financial, security, loan, equity, or management interest, any business in the global pneumatic ice protection market valued over $25 million during the term of this Final Judgment.

B.      Such notification shall be provided to the United States in the same format as, and per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 8 of the instructions must be provided only about pneumatic ice protection systems.  Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction.  If within the 30-day period after notification, representatives of the United States make a written request for additional information, Defendants shall not consummate the proposed transaction or agreement until thirty (30) calendar days after submitting all such additional information.  Early termination of the waiting periods in this Paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder.  Section XII shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under Section XII shall be resolved in favor of filing notice.

## XIII.    NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.  The Acquirer of the Ice Protection Divestiture Assets may not acquire from Defendants during the term of this Final Judgment any assets or businesses that compete with the Ice Protection Divestiture Assets.  The Acquirer of the THSA Divestiture Assets may not acquire

from Defendants during the term of this Final Judgment any assets or businesses that compete with the THSA Divestiture Assets.

## XIV.    **RETENTION OF JURISDICTION**

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.    **ENFORCEMENT OF FINAL JUDGMENT**

A.    The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court.  Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of the decree and the appropriateness of any remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

B.    The Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face.  In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.      In any enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with such other relief as may be appropriate.  In connection with any successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as any other costs including experts' fees, incurred in connection with that enforcement effort, including in the investigation of the potential violation.

## XVI.      EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry, except that after five (5) years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and that the continuation of the Final Judgment no longer is necessary or in the public interest.

## XVII.      PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, any comments thereon, and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and responses to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16:


_____

United States District Judge